UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| **KANDACE BARKHAM** | ) |
| | ) |
|     **PLAINTIFF** | ) |
| | ) CIVIL ACTION NO. 3:24-cv-473-GNS |
| v. | ) |
| | ) |
| **PINNACLE TREATMENT** | ) |
| **CENTERS KY-I, LLC** | ) |
| | ) |
|     **DEFENDANT** | ) |

## COMPLAINT

### I.    PARTIES, JURISDICTION AND VENUE

1. Kandace Barkham (hereinafter "Barkham" or "Plaintiff") is a Louisville, Jefferson County, Kentucky resident.

2. Defendant, Pinnacle Treatment Centers KY-I, LLC (hereinafter "PTC" or "Defendant") is a foreign corporation doing business in Kentucky.

### II.    JURISDICTION AND VENUE

3. This is an action for violations of the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §126 *et. seq.*, as well as, KRS § 344 *et. seq.* and wrongful termination in violation of public policy.

4. This Court has original jurisdiction pursuant to the provisions of 29 U.S.C. § 621 et. seq.

5. Venue is proper in this district because the actions giving rise to this Complaint occurred in this judicial district.

6. Plaintiff has previously exhausted her available administrative remedies and has been issued a Right to Sue from the Equal Employment Opportunity Commission.

## III.  FACTUAL BACKGROUND

7. Barkham was hired by PTC on March 22, 2023.

8. Barkham was hired to the position of Regional Clinical Director over PTC's various locations, most notably, its location in Elizabethtown, Kentucky.

9. PTC is an employer under the ADA.

10. The ADA prohibits discrimination on the basis of a disability or perceived disability.

11. The ADA requires employers to reasonably accommodate disabled employees, including providing ADA accommodation paperwork upon request.

12. Throughout her employment at PTC, Barkham proved to be a successful and reliable employee, never being issued any warranted verbal or written warnings regarding her performance, attendance, or behavior.

13. On February 26, 2024, Barkham, who had previously been diagnosed with autism, specifically requested ADA accommodation paperwork from PTC's Human Resources Manager, Darlene Mattice (hereinafter "Mattice").

14. Barkham requested the following reasonable accommodations from PTC:

    i. Restricting the excess travel that she had been forced to do, despite her job description indicating that only twenty percent (20%) of the position included travel;

    ii. For advanced notice prior to travel assignments; and

    iii. For consistent written feedback on performance to discuss areas where improvement may be needed.

15. Mattice informed Barkham that she did not "need" to have formal accommodation paperwork, but rather they could set-up a meeting with Barkham's direct supervisor, PTC's Vice President of Residential Services, Peggy Gemperline (hereinafter "Gemperline"), to discuss her specific requests.

16. Barkham had previously attempted to have the accommodation request discussions with Gemperline, which Gemperline refused to engage in on multiple occasions.

17. Mattice's refusal to engage in the interactive process is direct evidence of failing to accommodate an employee's disability as required by federal law and additionally in refusing to provide Barkham with ADA accommodation paperwork, which she was legally entitled to receive.

18. Beginning in December 2023 and lasting until her unlawful termination, Barkham made multiple requests to Gemperline to reassess her position and to put in place the above-mentioned accommodations.

19. Barkham was never provided with accommodation paperwork for her physician to fill-out and submit, nor were any of her requested accommodations met.

20. On approximately February 8, 2023, a PTC Clinician engaged in a formal, legally protected complaint to Barkham regarding fraudulent and deceptive billing practices being ordered by the Defendant's Executive Director and Clinical Director.

21. Following the complaint, Barkham immediately notified the Company's Compliance department and commenced an investigation.

22. Although PTC's policy states that the Clinical Director is to perform any investigations into such unlawful or unethical actions, because the allegations of illegal billing schemes involved the Clinical Director, Barkham, as PTC's Regional Clinic Director, was assigned to participate in the investigation, along with assistance from the Compliance department.

23. Within days of assuming the investigative role, Barkham became extremely concerned about not only the billing practices of the Elizabethtown PTC location, but also for the overall safety of the patients and staff.

24. Specifically, through interviews with numerous PTC employees, Barkham discovered the following unlawful activities were occurring on a prevalent basis:

   i. The Clinical and Executive Directors had ordered two (2) therapists, who were unlicensed and did not have a supervision contract, to treat patients without proper management or oversight. Equally concerning, the Executive Director would order the therapists to falsify the medical and billing documentation to specifically indicate that the Executive Director was present and treating the patients, even though she never did.

   ii. The Clinical and Executive Directors had ordered a PTC Clinician to falsify billing records, specifically to bill three (3) hours of time when a patient was only seen for one and one-half (1.5) hours.

   iii. Residential Aides, at the direction of the Executive Director, were falsifying medical records, stating that patients, who were medically unable to work, could work, and only allowed patients to work at a single location, which offered a referral bonus to the Residential Aides.

   iv. The Executive Director forced patients to work under threat of administrative discharge, and intentionally prevented patients from seeking medical treatment from their doctors, stating that they would be medically discharged from PTC if they attempted to set-up an appointment.

   v. A PTC Clinician, who had previously submitted the requisite ADA accommodation paperwork for her mental health disabilities, was being subjected to discriminatory comments by co-workers, to the point where the employee became suicidal. In reality, PTC failed to file her paperwork and refused to abide by her reasonable accommodation requests, directly resulting in her mental health issues becoming more severe.

       a) Ultimately, this same Clinician became actively suicidal due to her severely increased mental health issues. After reporting the same to HR, including the serious safety issue that the Clinician posed to herself, Barkham was told "not to be concerned."

       b) As the situation escalated further, PTC management, specifically Gemperline, continued to ignore the issue.

   vi. A PTC Clinician had engaged in a legally protected activity of complaining to the Company's Compliance department regarding time fraud issues that were ongoing at the Elizabethtown location.

       a) Within a week or two after the Clinician's complaint to Compliance, Barkham was ordered to create and issue a Performance Improvement Plan ("PIP") to the Clinician and informed that this Clinician needed to be terminated after the PIP was issued.

b) Barkham rightfully refused to issue the employee a PIP because it was a retaliatory employment action for engaging in a protected activity of reporting time fraud.

25. From her interviews and investigation, Barkham relayed several of the issues listed above to PTC's Chief Compliance Officer, Kelly Priegnitz (hereinafter "Priegnitz"), and Gemperline via email. [A copy of Barkham's 2/10/2024 Email is attached hereto as Exhibit "1"].

26. Additionally, the other issues of fraud, as well as patient and staff safety, were discussed with Priegnitz and Gemperline in various calls or meetings.

27. Following these disclosures, Priegnitz and Gemperline discouraged Barkham from further reporting or addressing these serious and severe billing fraud and patient safety issues through the appropriate channels.

28. Barkham became extremely concerned that each legitimate and unlawful business practice or health and safety issue that she raised was met with resistance and that she was even told to ignore the issues.

29. On February 29, 2024, Barkham felt that she had no other choice but to tender her resignation specifically due to the unlawful activities and legitimate patient health and safety issues.

30. Barkham provided PTC with a thirty (30) days' notice of resignation.

31. On the same day, shortly after submitting her resignation, PTC's Human Resources Manager called Barkham.

32. During this discussion, Barkham **rescinded** her resignation, on the specific condition that the unlawful activities would be addressed during the investigation.

33. Still on February 29, 2024, Barkham received another phone call from TPC's Human Resources Manager, informing her that the Defendant was terminating her employment, effective immediately, specifically stating "that location [Elizabethtown, KY] needed stability."

5

34. Barkham was left confused as she had agreed to rescind her resignation only hours prior due to PTC's commitment to address and correct the unlawful activity.

35. Following her unlawful termination, Barkham has suffered from extreme emotional distress due to the sudden discharge, as well as the Company's refusal to become in compliance with all laws and regulations as it regards billing and patient safety.

36. Barkham has been suffering from symptoms associated with anxiety and depression, including increased stress, inability to sleep, and embarrassment.

37. Barkham has suffered severe damage to her professional reputation after the Company falsely claimed that she quit her position with no prior notice.

### III.   CLAIMS AND CAUSES OF ACTION

#### COUNT I.   VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

38. Barkham re-alleges all allegations contained in paragraphs 1 through 37 above as if fully set forth herein.

39. PTC's actions constitute disability discrimination and failure to accommodate in violation under 42 U.S.C. § 126 *et. seq.*, specifically the ADA.

40. As a result of PTC's violation of the ADA, Barkham has been damaged in an amount in excess of the minimum jurisdictional limits of this court.

#### COUNT II.   PUBLIC POLICY WRONGFUL DISCHARGE

41. Barkham re-alleges all allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42. PTC's retaliation and termination of Barkham for making legitimate complaints regarding falsification of business records is against public policy, and thus unlawful, as established under Kentucky law, *Pari-Mutuel Clerks' Union v. Ky. Jockey Club, Ky.*, 551 S.W.2d 801 (1977).

43. As a result of PTC's unlawful termination in violation of public policy, Barkham has been damaged in an amount in excess of the minimum jurisdictional limits of this court.

### COUNT III.   KRS 216B.165 RETALIATION

44. Barkham re-alleges all allegations contained in paragraphs 1 through 43 above as if fully set forth herein.

45. PTC's actions constitute retaliation in violation of KRS 216B.165 which is actionable by operation of KRS 446.070.

46. As a result of PTC's violations of KRS 216B.165, Barkham has been damaged in an amount in excess of the minimum jurisdictional limits of this court.

### COUNT IV.   PRIVATE CAUSE OF ACTION FOR DEFENDANT'S VIOLATION OF KRS § 216B.165

47. Barkham re-alleges all allegations contained in paragraphs 1 through 46, inclusive herein, as though fully set forth at this point in their entirety.

48. KRS § 216B.165, *et seq*. provides no civil remedy for individuals, including Barkham, who suffer damages from the violation of the statute.

49. Barkham is within the class of individuals that KRS § 216B.165, *et seq*. is intended to protect.

50. Barkham's injuries are of the type that KRS § 216B.165, *et seq*. was designed to prevent.

51. KRS § 446.070 provides individuals, like Barkham, to recover damages suffered due to Defendant's violation of KRS § 216B.165, *et seq*.

52. KRS § 446.070 states: "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

53. As a result of Defendant's actions and violations of KRS § 216B.165, *et seq.*, Barkham is entitled to monetary damages pursuant to KRS § 446.070, in an amount in excess of the minimum jurisdictional limits of this Court.

### COUNT V.  MANDATORY RECOVERY OF ATTORNEY'S FEES AND COSTS

54. Barkham re-alleges all allegations contained in paragraphs 1 through 53 above as if fully set forth herein.

55. Barkham is mandatorily entitled to recover his attorney's fees and costs pursuant to the provisions of either the ADA or KRS.

### IV.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Kandace Barkham, respectfully prays that she be awarded the following relief and all other relief to which he may be entitled against the Defendant, Pinnacle Treatment Centers KY-I, LLC:

A. Trial by jury;

B. Judgment against the Defendant on all claims asserted herein;

C. Compensatory damages including but not limited to past and future lost wages and past and future lost benefits;

D. Compensatory damages including but not limited to emotional distress, mental anguish, humiliation and embarrassment;

E. All statutory remedies provided by the ADA and KRS;

F. Punitive damages to punish and deter similar future unlawful conduct;

G. An award of statutory attorney fees, costs and expenses;

H. Statutory interest on all monetary damage awards, verdicts, or judgments; and

I. All other and additional relief to which Barkham may be entitle

Respectfully submitted,

THE ZOPPOTH LAW FIRM

/s/ *Mitchell E. Esterle*
Bradley S. Zoppoth
Mitchell E. Esterle
6510 Glenridge Park Place, Suite 1
Louisville, KY  40222
(502) 568-8884
bsz@zoplaw.com
mee@zoplaw.com
*Counsel for the Plaintiff, Kandace Barkham*